IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HARRY MANLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 09-0096 |
| | ) |
| ABBOTT LABORATORIES, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM

Gary L. Lancaster,
Chief Judge.

August $25$, 2010

This is an action in employment discrimination.
Plaintiff Harry Manley ("Manley") alleges that defendant, Abbott
Laboratories ("Abbott"), discriminated against him on the basis of
his race and age in violation of Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"), the Age
Discrimination and Employment Act, 29 U.S.C. §621 et seq ("ADEA"),
and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. §955
et seq ("PHRA").

Before the court is Abbott's motion for summary judgment
[Doc. No. 25]. Abbott contends that Manley cannot state a prima
facie case of discrimination, and, even if he could, that he cannot
rebut Abbott's legitimate, non-discriminatory reasons for his
firing. In response, Manley argues that there are genuine disputes
of material fact that preclude a grant of summary judgment.

For the reasons to follow, Abbott's motion for summary
judgment will be granted.

## I. Factual Background

All material facts discussed herein are undisputed unless otherwise indicated. We construe all facts in favor of Manley, the non-moving party.

Manley is an African-American man who lives in Monroeville, Pennsylvania. Abbott, based in Abbott Park, Illinois, is a global health care company engaged in the business of, inter alia, manufacturing and selling pharmaceuticals. It has an office located at 202 Boxwood Court, McMurray, Pennsylvania.

### A. Manley's Job Duties

Manley worked at Abbott from March 29, 2004 through July 2006. At the time of his hiring, Manley was 47 years old. He was recruited by Jeffry Messerly, a 49 year old Caucasian male, who interviewed and hired Manley for the position of Senior Sales representative. Messerly supervised a total of ten salespersons, including Manley. Manley was one of two African Americans who worked under Messerly, the other being Dennis Stitch. Manley was the oldest sales representative supervised by Messerly.

As a sales representative, Manley's duties included promoting a portfolio of products within his Monroeville, Pennsylvania territory. During his employment with Abbott, Manley worked in conjunction with three to five teammates. All sales group members had the same duties of calling on physicians,

2

delivering product samples and promoting a portfolio of products. As part of his promotional activities, Manley led programs in which he would invite doctors to gain clinical knowledge of Abbott's products in the hope that they would prescribe them to their patients.

## B. Manley's Performance Evaluations

Messerly followed Abbott's performance management plan in trying to manage the performance of his sales staff. According to that plan, the first step in the performance management process is a coaching and counseling letter, which is issued to formally notify an employee that his or her performance did not meet expectations. Such a letter typically gives an employee 30-60 days to improve his or her performance in specific competencies. If the employee has not improved substantially following the issuance of the letter, the next step is to initiate a performance improvement plan ("PIP").

After his first year of employment, Manley received a "partially achieved" expectation review from Messerly. This is the second lowest out of four possible rating categories: exceeds expectations, achieved expectations, partially achieved expectations, and not achieved expectations. In 2005, Manley again received a rating of partially achieved expectations. On February 23, 2006, Messerly gave Manley a PIP, at least in part because of

3

high variances in his inventory of drug samples. [Doc. No. 28, Tab B, p. 54-55]. On June 6, 2006, Messerly extended and reissued Manley's PIP because of the events at restaurant Eleven and for "[n]ot meeting call frequency expectations of the business plan. Missed dinner appointment on March 27 due to illness . . . partner had no knowledge of dinner appointment. Improper execution of Product Marketing funded selling events." [Doc. No. 28, Ex. 4, p.95]. During his employment with Abbott, Manley was the only sales representative in Messerly's territory to receive a performance improvement plan.[1]

## C. Abbott's Operating Procedures for Program Funding

As part of their promotional activities, Abbott sales representatives often hosted events for health care professionals to inform them of the benefits of their products. Sales representatives were required to provide an itemized receipt and a list of those in attendance. Abbott's Operating Procedures allowed

---

[1]

However, other members of Manley's sales team also received disciplinary actions, including: Kristi Kitsko, a 40 year old Caucasian female, who received a partially achieved rating in 2005; Aaron Foust, a 32 year old Caucasian male, who received a coaching and counseling letter in 2005; and Jamie White, 26 year-old Caucasian female, who was counseled on three separate occasions. Dennis Stitch, the other African American in Manley's group, also received a coaching and counseling letter, but was later promoted to a level 3 sales representative on July 31, 2006 [Doc. No. 32, Ex. 4].

4

sales representatives to expend a maximum of $125 per health care professional or customer for off-site meals, including tax and gratuity. The Operating Procedures provide that "any violation of the Operating Procedures or falsification of records submitted in connection with the procedures may result in disciplinary action up to and including termination." [Doc. No. 28, Ex. 5, Tab G].

Meetings & Events International ("MEI") was the third party vendor that processed expense reports for Abbott during the time of Manley's employment. MEI reviewed the attendance and program receipts from sales representative events to ensure compliance with the company's spending limits. If an event was not compliant, MEI's policy was to contact the Abbott employee who initiated the program and inform him or her about the discrepancy.

## D. Events preceding Manley's termination

In early May, 2006, Kim Connors, a Caucasian female who was 39 years-old at the time, sent MEI a program initiation form for an event to take place on May 17, 2006, at restaurant Eleven in Pittsburgh. At the event, Dr. Brent Clark would speak on the benefits of a drug called Tarka. MEI sent Connors an attendance sheet with her name and that of Dr. Clark pre-printed on the form. Connors signed her name on the document, with the intent to attend the program.

May 17, 2006 was Connors' wedding anniversary. That day,

5

her husband called and asked her to go to dinner that evening. Connors asked Manley if he would cover the Tarka program, which he agreed to do. Connors gave Manley a folder containing the program information and the attendance sheet, which she had pre-signed.

Only Manley and Dr. Clark attended the event. They ordered seven appetizers, six entrees, and nine desserts. The total bill for the two of them came to $597, including food, tax and gratuity. Manley and Dr. Clark took some of the entrees and desserts home with them.

Despite the fact that only two people attended the event, the first attendance sheet submitted to MEI listed four attendees and their signatures - Dr. Clark, Kim Connors, Dr. Charles Taggart, and Manley.[2] A MEI representative contacted Connors and informed her that the total bill for the four people in attendance was over the $125 per person spending limit by $97.

Connors then returned the attendance sheet to Manley and asked him to obtain additional signatures. On May 31, 2006, while Manley was obtaining the additional signatures, Connors met with Messerly and informed him that her signature was on the first form

_____

[2]

> The parties dispute a number of facts about what happened subsequent to the May 17th dinner, including, inter alia, who submitted the first document to MEI, whether Connors knew that Manley had obtained signatures from those who had not attended the event when she turned in the second form, and whether Messerly believed that Connors had knowingly submitted a false document when he fired Manley.

6

sent to MEI, even though she had not attended the event. Messerly advised Connors to cross her name off the attendance sheet and to give an explanation on the form as to why she was not in attendance.

In the meantime, Manley obtained the signatures of two additional doctors, neither of whom had attended the event, and returned the form to Connors, who faxed it back to MEI after crossing out her name.[3] The second attendance form contained the signatures of five individuals: Dr. Brent Clark, Dr. Charles Taggert, Dr. Michael Hahalyak, Dr. Frank Sessoms, and Manley. With five signatures, the program was now in compliance with Abbott's spending policy.

E. Manley's Termination

On June 8, 2006, Manley and Messerly had a meeting to discuss the May 17, 2006 Tarka program. During the conversation, Manley admitted to Messerly that there had only been two attendees at the event and that he had added names and signatures of doctors who had not attended the dinner to the MEI attendance form. Messerly relayed this information to Robert Williams, his regional manager and Sue Percy, employee relations manager, who recommended

---

[3]

It is unclear whether Connors knew at this time that Manley had already obtained falsified signatures. However, that factual dispute is not material to deciding the pending motion.

and approved of Manley's termination for falsification of documents. Abbott terminated Manley's employment on June 28, 2006. He filed this lawsuit on January 27, 2009.[4] Abbott filed this motion for summary judgment after the close of discovery.

## II. Standard

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

"[T]he mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. Id. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the

---

[4]

We will presume that Manley received a right to sue letter from the EEOC before filing this suit. Manley states in his complaint that he satisfied all the jurisdictional prerequisites [Doc. No. 1, #7], and Abbott does not challenge this assertion.

8

nonmoving party.  Id. at 248-49.

The United States Supreme Court has "emphasized, [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotations omitted) (quoting Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

"A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and requires entry of summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In other words, in defending against summary judgment, a party cannot simply re-assert the facts alleged in the complaint; instead, he must "go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324 (internal quotations omitted).

It is on this standard that the court has reviewed the instant motion for summary judgment and briefs filed in support of and opposition thereto. For the reasons set forth below, the court will grant Abbott's summary judgment motion.

III. <u>Discussion</u>

Title VII provides that "it shall be an unlawful employment practice for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. The ADEA similarly provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age . . ." 29 U.S.C. § 623(a).

Here, there is no direct evidence of discrimination; therefore, the familiar burden-shifting framework of <u>McDonnell</u> must be used. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under <u>McDonnell Douglas</u>, plaintiff must first establish a <u>prima facie</u> case of discrimination by a preponderance of the evidence. <u>Stewart v. Rutgers</u>, 120 F.3d 426, 432 (3d Cir. 1997). If plaintiff establishes a <u>prima</u> <u>facie</u> case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. <u>McDonnell</u>, 411 U.S. at 802. To establish a legitimate non-discriminatory reason for its employment decision, Abbott must "'clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful

10

discrimination was not the cause of the employment action." <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 507 (1993). If the employer answers its relatively light burden, then the burden of production "rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994); <u>see</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000).

Abbott is entitled to summary judgment if there remains no genuine issue of material fact at any level of this framework. <u>Sherrod v. Philadelphia Gas Works</u>, 209 F. Supp. 2d 443, 449 (E.D. Pa. 2002). The ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff remains at all times with plaintiff. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

A. <u>Prima Facie Case</u>

In order to prove a <u>prima</u> <u>facie</u> case of discrimination under Title VII, the ADEA and the PHRA, Manley must establish that he: (1) is a member of a protected class (in this case, African American and over 40); (2) that he performed his job in a satisfactory manner; (3) that he suffered an adverse employment action; (4) under circumstances that give rise to an inference of unlawful discrimination, including whether similarly situated

individuals outside the protected class were treated differently. Jones v. Sch. Dist. of Phila., 198 F. 3d 403, 410-11 (3d Cir. 1999); Lamison v. Bottling Group, LLC, No. 07-306, 2009 WL 2707443, at *6 (W.D. Pa. Aug. 26, 2009); Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).[5] "The prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." Sarullo, 352 F. 3d at 797 (citing Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996)).

Here, the parties only dispute whether Manley has satisfied the second and fourth prongs of the prima facie test. To satisfy the second prong, Manley must present "some evidence that shows []he performed the duties required by [his] position in a satisfactory manner." Lamison, 2009 WL 2707443, at *6. To satisfy the fourth prong, Manley must show that he was treated differently than similarly situated individuals outside his protected class. Sarullo, 352 F. 3d at 797. To be similarly situated, other individuals "must have dealt with the same supervisor, have been

---

[5]

> The requirements for a prima facie case of Title VII race discrimination and age discrimination under the ADEA are substantially the same. Sarullo v. U.S. Postal Service, 352 F.3d 789, 797 (3d Cir. 2003) (citing Stanziale v Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000)). Furthermore, because the analysis required for adjudicating Manley's Title VII and PHRA is identical, the court will consider those two claims together. See Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 317, n.3 (3d Cir. 2000) (stating that because the analysis required for adjudicating a PHRA claim is identical to a Title VII inquiry "we therefore do not need to separately address" the PHRA claim).

subject to the same standards of employment and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." Hughes v. City of Bethlehem, No. 08-5444, 2007 WL 954120, at *4 (E.D. Pa. Mar. 27, 2007).

Manley argues that because other members of the sales department, Kim Connors in particular, engaged in similar or more egregious behavior that did not result in termination, he "must also be found to have been performing his job satisfactorily, despite his admissions to Mr. Messerly." [Doc. No. 29, p. 17].[6] In support of his argument, he lists numerous examples of behavior by other members of his sales team that allegedly violated Abbott's operating procedures but that did not result in discipline, including, inter alia, submitting attendance sheets lacking both signatures and the medical education numbers of doctors in attendance.

However, the court finds that a reasonable jury could not conclude that Manley was performing his job duties in a satisfactory manner. It is undisputed that a violation of the Operating Procedures or falsification of records submitted could result in termination [Doc. No. 28, Ex. 5, Tab G]. It is further undisputed that Manley was aware that his continued employment was

6

In so arguing, Manley appears to conflate his arguments for the second and fourth prongs.

13

based upon behavior consistent with Operating Procedures. [Doc. No. 28, at p. 23]. Manley admits to having ordered more food than permitted by company policy and to obtaining signatures by those who were not in attendance. He further admits to knowing that these actions violated company policy:

> Q: Were you aware it was a violation of Abbott's Code of Professional Conduct to make false or artificial entry on documents?
>
> A: Yes.
>
>             ***
>
> Q: And did you understand that your employment or continued employment was based on . . . behavior consistent with Abbott's Code of Conduct?
>
> A: Yes.
>
>             ***
>
> Q: Were you aware that when you and Dr. Clark ordered a total of $597 worth of food, tax and gratuity included, that you exceeded the $125 per person limit?
>
> A: Yes.
>
> Q: And so at that point, did you have an understanding that you were violating company policy by doing that?
>
> A: Yes.
>
> Q: Did you have an understanding if you were violating company policy when you took the food home to eat?
>
> A: Yes.
>
>             ***

Q: And what did you do to get signatures?

A: I just asked [Dr. Sessoms] to sign it to look as though he was attending this dinner.

Q: Did you think that was a violation of Abbott policy when you were doing that?

A: Yes.

[Doc. No. 28, Tag B, Ex. B].

Furthermore, Manley has not demonstrated that similarly situated individuals outside his protected class were treated differently. None of the examples Manley cites include behavior similar to what he admittedly did: ordered more food than allowed by company policy and created a false document to cover up that fact. The only other example of potentially similar behavior is Manley's contention in his affidavit that he told Connors that only two people had attended the May 17th program before she submitted the second revised attendance sheet to MEI. [Doc. No. 32, Ex. 1, p. 3].[7] If he had done so, then Connors did, in fact, knowingly submit a false document to MEI. Connors testified that she told Messerly that she had mistakenly pre-signed the MEI attendance form

_____

[7]

Manley also contends in his affidavit that on October 23, 2006, seven people attended a dinner at Monterey Bay, but $980 were spent, for a total of $140 per person. [Doc. No. 32-1]. However, a review of the receipt from that date shows that $130 were spent on audio/visual equipment, taking the average cost down to $121 per person, which is within the company's spending policy. [Doc. No. 32, Ex. 3, p. 36]. There is also no indication that a sales rep submitted a false document in connection with this event.

15

and failed to remove her name from the sheet before it was submitted to MEI.[8]

Manley has submitted an affidavit stating that he told Messerly before his firing that Connors knew that only two people had attended the program. However, this is contradicted by Manley's own deposition testimony:

> Q: Do you know when the second list of doctors were submitted to MEI vis-a-vis the dinner on May 17, 2006, whether or not [Connors] told Jeff Messerly that the individuals on that sheet weren't in attendance at the dinner?
>
> A: I don't know.
>
> Q: You don't know what Jeff Messerly knew about who was in attendance at that dinner?
>
> A: I don't know.
>
> Q: All you know is that you told Jeff Messerly that it was just you and one other doctor, and you told him that in about June of 2006, correct?
>
> A: Correct.

[Doc. No. 28, Tab B, pp. 202-03].

Manley may not create a dispute of material fact through his self-serving affidavit, which contradicts his deposition testimony and contains statements unsupported by the record. See Jimenez v. All American Rathskeller, Inc., No. 04-1897, 2006 WL

---

[8]

Although this fact remains in dispute, it is only relevant if Messerly knew that Connors had knowingly submitted a false document to MEI. If he did not, then the discrepancy between the treatment of Manley and Connors could not be attributed to discrimination.

16

1548874, at *4-5 (M.D. Pa. June 2, 2006 ("Because of the late disclosure of the information in the affidavit, its self-serving nature, the utter lack of evidence to bolster the contents of the record as a whole, and its unspecific assertions, we do not consider the affidavit competent evidence.") (citing Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)).     Other than Manley's affidavit, there is no evidence that Messerly had knowledge that Connors knew that only two people had attended the program when she submitted the second attendance sheet. In fact, in his deposition, Manley denied knowing that Connors knew that Manley had falsified a document:

> Q. Did Kim Connors tell you that (Manley) told her only he and Brent Clark were in attendance?
>
> A. No. No, sir.

[Doc. No. 28, ex. 4, p. 49].

Messerly further testified that he believed that Connors made a mistake in leaving her name on the attendance sheet, and that Connors did not know that only two people had attended the program because she was not at the dinner. [Doc. No. 28, Ex. 4, pp. 49, 56]. In Messerly's opinion, their behavior was not the same: "Connors made a mistake, Manley falsified a document." [Doc. No. 28, Ex. 4, p. 113]. As a result, the uncontradicted evidence before the court is that Messerly believed that Connors had mistakenly signed the attendance sheet while Manley had falsified

17

a document, a terminable offense.

Therefore, the court concludes that Manley has failed to prove his prima facie case of discrimination. The undisputed evidence before the court is that Manley admittedly engaged in behavior warranting his dismissal, while no other employee engaged in similar conduct.[9] As a result, the court will grant Abbott's motion for summary judgment.

B. Pretext

Even if Manley had established a prima facie case of discrimination, the court finds that Abbott has rebutted it with legitimate, non-discriminatory reasons for its employment decision. Abbott's stated reason for Manley's termination was violation of its company policies by spending nearly $600 on himself and one doctor (thereby exceeding the company's spending policies by nearly $350), and for obtaining and submitting signatures from non-attending doctors to make it appear as though the dinner complied with the company's spending limits.

In response, Manley fails to present any evidence that Abbott's proffered reasons are merely pretext for unlawful discrimination. The Court of Appeals for the Third Circuit has

---

9

While the parties do not argue this point, the court notes that Manley was also on a performance evaluation plan because of prior employment difficulties at the time of his firing, while Connors was not.

18

recognized two ways in which a plaintiff can prove pretext. Atkinson v. LaFayette College, 460 F.3d 447, 454 (3d Cir. 2006). First, Manley can present evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication." Fuentes v. Perskie, 32 F. 3d 759, 762 (3d Cir. 1994). Second, Manley can provide evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Id. "[T]he nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997) (citation omitted). The plaintiff must show not merely that the employer's proffered reason was wrong, but that it was "so plainly wrong that it cannot have been the employer's real reason." Id. at 1109. "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." Id. (citation omitted).

Manley does not deny that he spent more than the company permitted and created a false document. He also does not deny that in so doing, he knew that he was violating company policy. Instead

Manley argues that he was repeatedly disciplined and ultimately fired while younger white male and female salespersons, Kim Connors in particular, engaged in similar conduct but were not similarly disciplined. Manley also argues that he and Dennis Stitch, the other African-American sales representative, were the only individuals who received a coaching and counseling letter during the time that Manley was employed by Abbott. He also argues that Messerly was "forced" to hire minorities.

The court concludes that this evidence is insufficient to prove pretext. As already discussed, there is no evidence that other employees engaged in conduct similar to Manley's admitted behavior.[10] Furthermore, the evidence of record establishes that Stitch was actually promoted after completing the steps laid out in his coaching and counseling letter, and that at least two younger female and male salespersons also received coaching and counseling letters during Manley's employment. [Doc. No. 32, Ex. 4]. Finally, the court fails to see the relevance of Messerly's motivation for hiring Manley to the decision to fire him. Even if it were relevant, Messerly testified that he hired Manley because

---

[10]

> Manley uses the same evidence in support of both his prima facie case and pretext arguments. The court of appeals has recognized that "evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the McDonnell Douglas formula requires us to ration the evidence between one stage or the other." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000)

he knew him and believed he was the best qualified candidate. [Doc.
No. 28, Ex. 4, p. 152].

IV. Conclusion

        In conclusion, the court finds that Manley presents no
evidence that Abbott's true motivation for firing him was either
his age or his race.

        An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HARRY MANLEY,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )    Civil Action No. 09-0096
                                       )
ABBOTT LABORATORIES,                   )
                                       )
            Defendant.                 )

## ORDER

AND NOW, on this 25 day of August, 2010, it is hereby
ORDERED that defendant's motion for summary judgment is GRANTED.

BY THE COURT,

_____, C.J.

cc: All counsel of record